## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KANELLOS D. CHARALAMPOUS, | ) | |
| through his Court-Appointed Guardian, | ) | |
| Constantine Charalampous; and | ) | |
| | ) | |
| THE KANELLOS D. CHARALAMPOUS | ) | |
| REVOCABLE TRUST; and | ) | |
| | ) | |
| THE CHARALAMPOUS FOUNDATION,) | | |
| an Oklahoma Not-for-Profit Corporation | ) | Case No. CIV-23-499-R |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBBIE LEE, STEPHEN MENDEL, | ) | |
| KATHRYN MENDEL, individuals, | ) | |
| and THE MENDEL LAW FIRM, LP, | ) | |
| a Texas Limited Partnership. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendants' The Mendel Law Firm, L.P., Stephen Mendel, and Kathryn Mendel's Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim for Which Relief Can Be Granted, and Improper Venue [Doc. No. 8] and Defendant Robbie Lee's Motion to Dismiss or, in the Alternative, Motion to Transfer Venue [Doc. No. 32]. Both motions are fully briefed and at issue [Doc. Nos. 16, 21, 26, 36, 41, 44].

### I.      BACKGROUND

This case concerns a dispute over the estate of Dr. Kanellos Charalampous, a 91-year-old man who suffers from Alzheimer's. Plaintiffs are Dr. Charalampous (through his court-appointed guardian and son, Constantine, also known as Conrad), the Kanellos D.

Charalampous Revocable Trust, and The Charalampous Foundation, a non-profit organization run by Conrad and his brother, Phillip. Defendants include Stephen Mendel (a practicing attorney in Houston), The Mendel Law Firm, LP (Stephen's firm), Kathryn Mendel (Stephen's wife), and Robbie Lee, who acted as Dr. Charalampous' paid caretaker for several years.

Plaintiffs allege Defendants engaged in a conspiracy to siphon money from Dr. Charalampous, principally by causing him to execute a new estate plan that benefits Ms. Lee and Mr. Mendel. Defendants claim Dr. Charalampous was capable of—and desired to—change his estate plan to reduce his sons' inheritance and better reflect his philanthropic wishes.

Dr. Charalampous was born in Greece but had been a Texas resident for nearly seventy years prior to the events leading to this suit. Doc. 16-6: GAL Motion at 2. Through his psychiatry career and art collecting, he amassed an estate of nearly fifteen million dollars. *Id.* Dr. Charalampous was proactive in his philanthropic efforts and estate planning. He established the Dexion Foundation in 1965. Doc. 1-4: Petition at ¶ 16. The Charalampous Foundation, a Plaintiff, is the successor-in-interest to Dexion. *Id.* at ¶ 10. The Directors of the Foundation are Dr. Charalampous' two sons. *Id.* at ¶ 17. In 2016, Dr. Charalampous created an estate plan that established the Trust. *Id.* at ¶ 18. He designated his sons, Conrad and Phillip, as his attorneys-in-fact, beneficiaries of the Trust, and

successor trustees. *Id.* Following a codicil in 2017, the Trust contained nearly all of Dr. Charalampous' estate, including both Texas and Oklahoma-based assets.[1] *Id.* at ¶ 19.

Dr. Charalampous' health began to deteriorate in 2019. He had a car accident in March of that year. *Id.* at ¶ 20.  In April, he spent five days in the hospital after he was found next to his car in an altered mental state with his own feces on him. *Id.*; Doc. 36-1 at ¶¶ 5-6. During this hospital stay, Dr. Charalampous was diagnosed with and prescribed medication for dementia.[2] *Id.* Only Defendant Lee accompanied Dr. Charalampous during this hospital visit, and she signed the discharge paperwork noting his dementia. Pet. at ¶ 24. Despite this diagnosis, the sons evidently remained unaware of their father's declining mental capacity until visiting him in the spring of 2021. Doc. 36-1 at ¶¶ 7-8. On May 14, 2021, Conrad took his father to a psychiatrist, who diagnosed Dr. Charalampous with "moderate dementia, Alzheimer's type" and stated that he was "no longer competent to manage [his] finances[.]" Doc. 16-1.

Plaintiffs allege Defendant Lee used her position as a caretaker to take advantage of Dr. Charalampous and mislead his sons through various acts.[3] These include:

- concealing Dr. Charalampous's 2019 dementia diagnosis from his sons by falsely attributing the five-day hospital stay that resulted in the diagnosis to dehydration. Doc. 36-1 at ¶ 6.

---

[1] His Greece-based assets were excluded from the Trust. *Id.* at ¶ 19.

[2] Dr. Charalampous was also admitted to the hospital in November of 2019 for an overnight stay. Pet. at ¶ 20.

[3] It is unclear exactly when Defendant Lee's position as caretaker began. The Petition states Robbie Lee functioned as caretaker for Dr. Charalampous during the 2019 health incidents. Pet. at ¶ 24. Elsewhere, Conrad states Lee was employed as caretaker from May 2021 to October 2022. Doc. 36-1 at ¶ 4. The Court presumes that is not the exclusive time she acted as caretaker, as it is inconsistent with allegations in the Petition.

Case 5:23-cv-00499-R   Document 45   Filed 02/06/24   Page 4 of 22

- refuting the sons' suggestion Dr. Charalampous had declined cognitively and needed to be taken to a psychiatrist in 2021, despite her awareness of his 2019 dementia diagnosis.[4] *Id.* at ¶ 7.

- rebuffing Conrad's subsequent offer to move to Houston and care for his father by saying she would notify him when more substantial and professional healthcare than she could provide was needed. *Id.* at ¶ 8.

- engaging in regular sexual acts with Dr. Charalampous (which Plaintiffs allege constitutes battery) to maintain control over him. Pet. at ¶¶ 3, 27.

- withholding Dr. Charalampous' Alzheimer's and dementia medications to make him easier to control. *Id.* at ¶ 28.

- purchasing personal items using Dr. Charalampous' money. *Id.* at ¶ 29.

- conspiring with Mendel Defendants to effect changes to Dr. Charalampous' estate plan that would benefit her. *Id.* at ¶¶ 30-36.

In January 2022, Defendant Lee and Dr. Charalampous visited Defendant Stephen Mendel at his office at The Mendel Law Firm for the first time. Pet. at ¶ 33. A few months later, Dr. Charalampous purportedly executed a new estate plan, which contrasted starkly from the plan he had republished via codicil five years earlier. *Id.* The plan:

- created a new trust and assigned all of Dr. Charalampous' assets to it, including assets previously assigned to the Plaintiff Trust and Plaintiff Foundation. *Id.*

- bequeathed the sons 2.5 million dollars each under the new plan, a significant decrease from the prior plan. Doc. 16-6 at 5-6.

- dedicated the remaining 10 million dollars of Dr. Charalampous' trust to philanthropic causes. *Id.*

- appointed Defendant Stephen Mendel as the successor trustee.[5] *Id.*

---

[4] Unaware of Lee's knowledge of the 2019 diagnosis, the sons believed she had simply not noticed their father's gradual cognitive decline due to being near him every day. Doc. 36-1 at ¶ 7.
[5] The details of this plan come from statements by Plaintiffs and Defendant Lee in various pleadings. The Mendel Defendants have neither provided Dr. Charalampous (now under guardianship of his son) nor this Court a copy of these estate planning documents in their totality.

- was paid for via a $5,500 check issued from Dr. Charalampous' account to Defendant Kathryn Mendel with the memo line reading "ART."[6] Pet. at ¶ 35; Doc. 16-11.

Defendants claim Dr. Charalampous' 2022 estate plan was above board. The Mendel Defendants state they relied on a psychiatric evaluation in early 2022 that Dr. Charalampous had testamentary capacity. Doc. 21-1 at ¶¶ 5A-D. Additionally, they note Defendant Lee was neither designated as a beneficiary in the new estate plan nor included in substantive decision making. *Id.* at ¶¶ 9A-D.

In the fall of 2022, events came to a head. Dr. Charalampous' sons remained unaware of the changes to his estate plan or Defendants' alleged scheme until late October 2022. Pet. at ¶¶ 37-42. They discovered the alleged scheme when Dr. Charalampous called Conrad, confused as to whether he had transferred stock to Defendant Lee. *Id.* at ¶ 38. In the following days:

- Conrad called his father's stockbroker at Edward Jones and learned Dr. Charalampous had initiated a transfer of nearly $400,000 of stock to Defendant Lee. *Id.*; Doc. 16-8.
- Conrad learned Dr. Charalampous had purportedly revoked the 2016 Powers of Attorney given to his sons via an instrument executed at The Mendel Law Firm on the same day as the stock transfer.[7] Pet. at ¶ 40.
- Conrad told Defendant Lee her actions with the Edward Jones account were criminal. *Id.* at ¶ 43.
- Defendant Lee returned cash in lieu of the stock she had been given via the transaction. *Id.* at ¶ 43.

---

[6] Plaintiffs allege this check was an attempt at deceiving the sons about the nature of the payment. Pet. at ¶ 35. Defendants acknowledge the payment was for legal services and claim the memo line was inserted by Dr. Charalampous or Lee. Doc. 21-1 at ¶ 6G. They do not address why the check is made to Ms. Mendel. *Id.*

[7] Defendants claim that Dr. Charalampous, being capable at the time, sought to revoke these powers in anticipation his sons would challenge the gift to Defendant Lee. Doc. 16-6 at 7; Doc. 21-1 at ¶¶ 7A-D.

- Conrad took his father back to the psychiatrist who had examined him in 2021. The doctor noted Dr. Charalampous' faculties had declined to the point that "formal guardianship is necessary." Doc. 16-3 at ¶¶ 12-13; Doc. 16-13.

Following these events in Texas, Conrad brought his father back to Conrad's home in Oklahoma and initiated formal guardianship proceedings in McClain County, Oklahoma. Doc. 16-3 at ¶¶ 14-15. On November 10, 2022, the court appointed Conrad as guardian of the person and estate of his father. Doc. 44-2. On February 2, 2022, Defendant Robbie Lee, through counsel, moved to intervene in the Guardianship proceeding and filed a Petition to Appoint Guardian Ad Litem ("GAL Petition") for Dr. Charalampous. Doc. 16-5; Doc. 16-6. In her GAL Petition, Defendant Lee expressed concern that Conrad may not be looking out for his father's best interests. *Id.* She stated that Dr. Charalampous would benefit from an independent guardian ad litem to assess the issues and "make sure [his] wish and intent are followed as it relates to his estate and estate plan." *Id.* at 9. The GAL Petition was later withdrawn and dismissed. Doc. 16-7 at 2.

Plaintiffs filed the present action in McClain County, Oklahoma, accusing Defendants of Breach of Fiduciary Duty, Undue Influence, Fraud, Intentional Infliction of Emotional Distress, Battery, Conversion, Embezzlement, Unjust Enrichment, Money Had and Received, Negligence, and Civil Conspiracy. Doc. 1-4. They seek damages and a declaratory judgment that documents executed by Dr. Charalampous in 2022 are invalid or unenforceable due to his incapacity. *Id.* Defendants removed the case based on diversity jurisdiction and now move to dismiss for lack of personal jurisdiction. Doc. 1. Specifically,

6

all Defendants argue they are citizens of Texas, the events in question all occurred in Texas, and any acts or effects of acts that occurred in Oklahoma are incidental to the dispute.

## II.    LEGAL STANDARD

This Court must have personal jurisdiction over Defendants to adjudicate Plaintiffs' claims against them. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Plaintiffs bear the burden of establishing personal jurisdiction. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008). When a motion is to be decided on the basis of parties' affidavits and written materials, the plaintiff need only make a prima facie showing of personal jurisdiction. *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 773 (10th Cir. 1997). The complaint's well-pled factual content "must be accepted as true if uncontroverted by the defendant's affidavits," and "factual disputes ... must be resolved in the plaintiff's favor when the parties present conflicting affidavits." *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) (internal quotation marks and citation omitted). Because Oklahoma's long-arm statute authorizes personal jurisdiction to the limits of the Due Process Clause, *see* OKLA. STAT. tit. 12, § 2004(F), the Court simply asks whether "the exercise of jurisdiction 'comports with the limits imposed by federal due process.'" *Walden*, 571 U.S. at 283 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).

Two types of contacts-based personal jurisdiction exist: general and specific. *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). Plaintiffs limit their arguments to specific jurisdiction. A court may exercise specific personal jurisdiction over an out-of-state defendant if it has "'certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (brackets, additional quotation marks, and additional citations omitted).

Additionally, the Supreme Court "has considered alongside defendants' interests those of the States in relation to each other." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021). "[S]pecific jurisdiction thus seeks to ensure that States 'with little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017).

"The minimum contacts test for specific personal jurisdiction has two requirements: (1) a defendant must have purposefully directed its activities at residents of the forum state, and (2) the plaintiff's injuries must arise out of the defendant's forum-related activities." *Dental Dynamics, LLC v. Jolly Dental Grp., LLC,* 946 F.3d 1223, 1229 (10th Cir. 2020) (internal quotation marks and footnote omitted) Even if this test is satisfied, a defendant may defeat jurisdiction by presenting a compelling case that jurisdiction is unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

## III.    DISCUSSION

Plaintiffs make three main arguments in support of exercising personal jurisdiction over Defendants. First, Plaintiffs argue Defendants engaged in conduct that, although physically occurring in Texas, caused significant effects in Oklahoma. Second, Plaintiffs argue the Mendel Defendants' refusal to return Dr. Charalampous' client files to him once he resided in Oklahoma independently confers jurisdiction. Third, Plaintiffs claim Defendant Lee consented to jurisdiction in Oklahoma via her intervention in the state court guardianship proceeding, and the Mendel Defendants, as co-conspirators in the alleged scheme to alter Dr. Charalampous' estate plan, are also subject to personal jurisdiction as a result. In other words, because Defendants were engaged in a conspiracy and Lee's intervention in the guardianship proceeding was in furtherance of the conspiracy, jurisdiction over Lee would also confer jurisdiction over the Mendel Defendants. Each argument is addressed in turn.

### A. Jurisdiction based on Defendants' Contacts with Oklahoma

Plaintiffs' primary argument in favor of finding personal jurisdiction is that Defendants purposefully directed their tortious conduct at Oklahoma. Notably, the Tenth Circuit has "a somewhat more restrictive approach" to purposeful direction. *Dudnikov*, 514 F.3d at 1074 n.9. To assess purposeful direction in the tort context, the Court applies the *Calder* effects test. "This test analyzes whether an out-of-state defendant's tortious conduct satisfies three elements: '(1) an intentional action; (2) expressly aimed at the forum state; and (3) . . . knowledge that the brunt of the injury would be felt in the forum state.'" *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966-67 (10th Cir. 2022) (quoting *Dental*

*Dynamics,* 946 F.3d at 1231). If a plaintiff fails to demonstrate even one of these elements, their assertion of purposeful direction—and thus specific personal jurisdiction—fails. *Eighteen Seventy*, 32 F.4th at 967.

This dispute turns on whether Plaintiffs can satisfy the second element of the effects test—express aiming. *Id.* at 968-69 (discussing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). In *Eighteen Seventy*, the Tenth Circuit reviewed several seminal cases discussing the "express aiming" element and defined it with these "helpful principles":

> In determining whether a defendant expressly aimed his conduct at the forum state, "a *plaintiff's* contacts with the defendant and forum" cannot "drive the jurisdictional analysis." *Walden*, 571 U.S.at 289. Rather, the forum state must be the "focal point" of *the defendant's* tortious conduct. *Newsome v. Gallacher*, 722 F.3d 1257, 1268 (10th Cir. 2013). Stated differently, "*the defendant's* conduct [must] connect [] him to *the forum* in a meaningful way." *Walden*, 571 U.S. at 290.

32 F.4th at 969. The Tenth Circuit goes on to describe how courts should identify the "focal point" of a defendant's conduct:

> [W]e have centered the express aiming analysis on whether the defendant's allegedly tortious conduct was focused on or directed at the forum state—not, as [plaintiffs] would seemingly have it, on whether the defendant's wrongful conduct was focused on or directed at the interests of the plaintiffs who reside in or otherwise have significant connections to the forum state.

*Id*. at 972. Thus, the issue in this case is whether Defendants' allegedly tortious conduct was focused on or directed at Oklahoma or merely directed at the interests of Plaintiffs who had significant connections to the state.

### A. The Mendel Defendants

The allegedly tortious conduct of the Mendel Defendants had its focal point in Texas. The Mendel Defendants resided in Texas, practiced law in Texas, and committed

all their allegedly wrongful acts in Texas. Moreover, any of Dr. Charalampous' allegedly invalid estate planning documents were drafted and executed in a Texas law office, utilized Texas law, and would have been settled and carried out by a successor trustee in Texas. Although the Mendel-created estate plan may have affected Oklahoma-based assets, Oklahoma was not the focal point of Defendants' conduct. Rather, the focal point of their alleged scheme was Dr. Charalampous, a Texas resident at the time. Defendants' conduct—allegedly manipulating Dr. Charalampous into creating a new estate plan—does not connect them to Oklahoma in a meaningful way. *See Walden*, 571 U.S. at 290.

A comparison to *Newsome* is illuminating as it depicts a scenario in which some out-of-state defendants made the forum state the focal point of their conduct and some did not. In *Newsome*, plaintiffs sued Canadian-based directors of a Canadian entity, Mahalo Energy, and a Canadian law firm. 722 F.3d at 1263. Mahalo had an American subsidiary (Mahalo USA) that operated exclusively in Oklahoma. *Id.* at 1262. The law firm represented both Mahalo Energy and Mahalo USA. *Id.* at 1279. The dispute arose because the Canadian directors allegedly knowingly saddled the American subsidiary with unsustainable debt, resulting in the subsidiary's bankruptcy, and the Canadian law firm provided legal services facilitating the transaction. *Id.* at 1262-63.

In a suit for breach of fiduciary duty, the Tenth Circuit found the individual directors were subject to personal jurisdiction in Oklahoma, but the law firm was not. *Id.* at 1262. Applying the *Calder* effects test, the Tenth Circuit reasoned that Mahalo USA's exclusive operations in Oklahoma made "Oklahoma the focal point of any tort [by the directors] against Mahalo USA." *Id.* at 1269. By saddling the subsidiary with debt, the directors had

tortiously intended to "disrupt [Mahalo USA's] forum-based activities" in Oklahoma. *Eighteen Seventy*, 32 F.4th at 974.

Conversely, the Tenth Circuit found the law firm was not subject to personal jurisdiction in Oklahoma. *Newsome*, 722 F.3d at 1280-81. The Tenth Circuit noted the firm represented Mahalo USA only through its representation of the Canadian parent company; it had not reached out to Oklahoma to solicit business. *Id.* at 1281. The Tenth Circuit recognized the Canadian firm had certain contacts with the forum, such as placing liens on Oklahoma property and receiving payment from Oklahoma bank accounts. *Id.* at 1281. Ultimately, however, it emphasized those contacts were ancillary, and "the firm was a Canadian entity hired by [a Canadian company] to perform legal work from Canada on transactions consummated in Canada." *Id.* at 1281.

Plaintiffs and Defendants both attempt to use *Newsome* to their advantage, but the Court finds the case favors Defendants. Plaintiffs argue the Mendel Defendants had knowledge of the harm their conduct would cause in Oklahoma, and thus, the Mendel Defendants are more comparable to the individual Canadian directors than the Canadian law firm. The Court disagrees.

In *Newsome*, the firm knew its work would affect Oklahoma property, in part, because Mahalo USA's operations were exclusive to Oklahoma. It placed liens on Oklahoma property and received payment from Mahalo USA, its Oklahoma client. The *Newsome* firm was necessarily aware its conduct would have effects in Oklahoma, yet the court found that knowledge was not enough to subject the firm to Oklahoma jurisdiction. Instead, it emphasized that the Canadian law firm performed legal work in Canada at the

behest of the Canadian parent company. Here, the Texas-based Mendel Law Firm performed legal work in Texas for a Texas client and took no direct action in Oklahoma.[8] Furthermore, the Charalampous Trust and Foundation were not exclusively comprised of Oklahoma assets. Thus, the Mendel Defendants have even fewer contacts with the state of Oklahoma than the firm in *Newsome* did. Furthermore, a tortious intent to act in Oklahoma, like that of the individual directors in *Newsome*, cannot be inferred.

Because Mendel Defendants did not expressly aim their conduct at Oklahoma, the second element of the *Calder* effects test is not satisfied. Exercising specific jurisdiction over the Mendel Defendants in Oklahoma would be inappropriate.

### B. Defendant Lee

The actions of Defendant Lee are likewise not expressly aimed at Oklahoma. The claims lodged against Defendant Lee accuse her of tortious conduct that occurred almost exclusively in Texas. The focal point of her alleged scheme revolved around the manipulation and control of Dr. Charalampous, a Texas resident at the time.

Plaintiffs point to several actions Lee took to establish minimum contacts in Oklahoma. They cite several examples of Lee either communicating misleading

---

[8] Plaintiffs cite to other cases wherein out-of-state attorneys were subject to jurisdiction due to their connections to the forum states. *See, e.g., Benson v. Rosenthal*, 116 F. Supp. 3d 702 (E.D. La. 2015); *Robinson v. Gianmarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996). The cases are inapposite. In *Benson*, the Texas defendant "purposefully availed himself of the benefits of the state of Louisiana" because he "accepted the responsibility of managing trusts he knew contained ownership interests in substantial Louisiana property." 116 F.Supp. 3d at 709. The attorneys in *Robinson* solicited the client relationship with a Florida resident and communicated with the client in the forum state extensively. 74 F.3d at 255-56. Here, a Texas attorney represented a Texas client whose estate held some assets in Oklahoma, a far cry from the ownership stake in New Orleans' professional sports franchises in *Benson*. The Mendel Defendants did not purposefully avail themselves of Oklahoma in the same way the attorneys in Plaintiffs' cases did.

information to or withholding information from Dr. Charalampous' sons in Oklahoma, accepting payment from the sons in Oklahoma, and other assorted communications to the forum state.[9] Plaintiffs recognize these actions are not at the core of the tortious conduct, but they argue these are steps in furtherance of Lee's scheme.[10] Plaintiffs' argument is not persuasive in light of the Tenth Circuit's analysis in *Eighteen Seventy*.

In that case, two Wyoming entities filed suit against a United Kingdom resident for breach of fiduciary duty. *Eighteen Seventy*, 32 F.4th at 959. Plaintiffs alleged the UK defendant expressly aimed his tortious conduct at Wyoming by communicating with the Wyoming plaintiffs and inducing their investment in a failed venture. *Id.* The Tenth Circuit, applying the *Calder* effects test, concluded "Wyoming[] was not the focal point of [the defendant's] allegedly tortious acts[,]" and his "contacts with the forum were too attenuated" to allow Wyoming to exercise jurisdiction. *Id.* at 981. It found plaintiffs' argument "place[d] undue emphasis on the fact that *their* principal place of business is in the forum." *Id.* at 971. Notably, the Tenth Circuit rejected plaintiffs' arguments that the UK defendant had purposefully directed his conduct at Wyoming because he filled out forms listing the plaintiffs' Wyoming address and knew of its partners' presence in the state. *Id.* at 977. Moreover, the defendant's email and phone contacts with those Wyoming partners "simply [were] not enough" to show express aiming at Wyoming. *Id.* at 979. The Tenth Circuit concluded "we should not 'attribute' the [plaintiffs'] connections to

---

[9] Doc. 36 at 11-13.
[10] The sons are not Plaintiffs to the suit, and they list these actions as examples of attempts to obscure their knowledge in Oklahoma of the plot against Plaintiffs she was carrying out in Texas.

[Wyoming]—however strong they may be—to [the defendant] and allow them to dictate the jurisdictional analysis." *Id.* (quoting *Walden*, 571 U.S. at 289).

Like the defendant in *Eighteen Seventy*, Defendant Lee did not make the forum state the focal point of her tortious conduct. Lee's conduct was not motivated by Plaintiffs' location in Oklahoma or the location of Dr. Charalampous' assets. Although Defendant Lee necessarily had to communicate with Dr. Charalampous' sons in Oklahoma, those communications were not the focal point of her scheme. The communications, even if they furthered her alleged scheme, were fortuitously directed at Oklahoma solely by virtue of a third party's presence in the state. That is an "insufficient basis for jurisdiction[,]" *Walden*, 571 U.S. at 286, and improperly allows the Plaintiffs' connections to Oklahoma "to dictate the jurisdictional analysis." *Eighteen Seventy*, 32 F.4th at 979.

Defendant Lee's intervention in Dr. Charalampous' guardianship proceeding is also an insufficient contact to confer Oklahoma jurisdiction.[11] Lee's intervention in the guardianship proceeding was indisputably a contact with Oklahoma, but it cannot be said Plaintiffs' injuries "[arose] out of [this] forum-related activit[y]." *Dental Dynamics*, 946 F.3d at 1229. Her request a guardian ad litem be appointed to objectively protect Dr. Charalampous' interests is attenuated to her alleged tortious scheme. A guardian ad litem may have, in fact, supported guardianship by Dr. Charalampous' son. Thus, there is not an "adequate connection" between Plaintiffs' alleged harm and Lee's (unsuccessful) GAL petition Oklahoma. *Id.*

---

[11] Defendant Lee's intervention in the Oklahoma guardianship proceeding will be discussed as an independent path to jurisdiction in Section III (C), but it is addressed as a separate "contact" here.

**B. Jurisdiction based on the Failure to Return Client Files**

Plaintiffs also contend the Mendel Defendants' refusal to return documentation of his estate plan—the basis of a breach of fiduciary duty claim—is an action directed at Oklahoma because Dr. Charalampous is now an Oklahoma resident. Whereas other claims have harms that were felt exclusively in Texas, the refusal to turn over documents that a current Oklahoma resident requested via an Oklahoma law firm is, according to Plaintiffs, a harm expressly aimed at Oklahoma. Plaintiffs then connect the denial of these documents to the overarching conspiracy against them. Thus, the denial of documents to an Oklahoma resident sweeps up all Defendants and all related claims into Oklahoma's jurisdiction via the conspiracy.

This theory falls victim to the same fatal flaw as Plaintiffs' other examples of specific contacts with Oklahoma: it places too much weight on the location of the Plaintiff and third parties. Plaintiffs cite *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999), in support of their argument. In *Wien Air*, a German lawyer was accused of fraud and breach of fiduciary duty by a Texas-based client relating to a failed business deal in Germany. *Id.* at 209-210. The lawyer allegedly refused to disclose material information to his Texas client. *Id.* at 213. A District Court initially found Texas did not have personal jurisdiction over the German lawyer, but the Fifth Circuit reversed. *Id.* at 209. The Fifth Circuit reasoned that the German lawyer had the requisite minimum contacts with Texas, given the lawyer's repeated trips to Texas, numerous letters and phone calls to his client in Texas, and the continual nature of communications to the forum state. *Id.* at 212-15. Of

note, too, the attorney-client relationship began when the lawyer visited the client in Texas. *Id.* at 209.

*Wien Air* is distinguishable from the present case because of the extent of the defendants' contacts with the forum state. The Mendel Law Firm and Stephen Mendel initiated their client relationship with Dr. Charalampous, a Texas resident, at the Firm's office in Texas. The Defendants performed all their legal services in Texas, met with their client in Texas, and communicated with their client in Texas. The firm's only communication in Oklahoma occurred once their client had relocated and requested documents through new counsel in Oklahoma. The German counsel in *Wien Air*, on the other hand, traveled to the client's chosen forum state extensively, performed services there, and communicated across borders continually. Plaintiffs point to only one instance of the Mendel Defendants corresponding with an Oklahoma firm and declining to provide the requested documents. Under the specific facts of this case, the Mendel Defendants' actions are insufficient to subject them to jurisdiction in Oklahoma.

Subjecting the Mendel defendants to Oklahoma's jurisdiction under Plaintiffs' theory would also create a pathway to forum shopping. An enterprising plaintiff could ask their reticent counsel for documents in any state they so choose with the aim of subjecting counsel to jurisdiction in that state. Dr. Charalampous was a Texas resident when he became a client of a Texas law firm. The firm, citing the Texas Disciplinary Rules of Professional Conduct, now refuses to return the Texas-based estate plan documentation to their former client. Doc. 21-1 at ¶ 2A. Accordingly, Texas has a much stronger interest in resolving this attorney-client controversy than Oklahoma does. *See Ford Motor Co.*, 141

S.Ct. at 1025 ("[S]pecific jurisdiction thus seeks to ensure that States with little legitimate interest in a suit do not encroach on States more affected by the controversy.") (internal quotation marks omitted).

Texas remains the focal point of this allegedly tortious conduct, even considering Dr. Charalampous' relocation. Reaching the opposite result would impermissibly allow a plaintiff's location, not a defendant's conduct, to "drive the jurisdictional analysis[.]" *Walden*, 571 U.S.at 289.

**C. Jurisdiction by Consent through the Guardianship Proceeding**

Plaintiffs devote considerable effort to developing a theory that Defendant Lee consented to jurisdiction within Oklahoma solely by virtue of her intervention in Dr. Charalampous' guardianship proceeding in McClain County, Oklahoma. In other words, because Lee filed a motion with a court in Oklahoma in a matter regarding Dr. Charalampous, she automatically invited Oklahoma courts to exercise power over her in related matters. This theory has some support in case law. Upon closer examination, however, the underlying support for "jurisdiction-by-intervention" in other cases is not present here. Consequently, this court finds Defendant Lee is not subject to personal jurisdiction in this case via her intervention in the guardianship proceeding.

Plaintiffs cite to numerous cases illustrating the rule of jurisdiction-by-intervention. *See, e.g.. Gen. Contracting & Trading Co. v. Interpole, Inc., 940 F.2d 20 (1st Cir. 1991)*; *City of Santa Clara, Cal. v. Kleppe*, 428 F. Supp. 315, 317 (N.D. Cal. 1976). They also argue the rationale is similarly exemplified by cases in which a party filed a parallel case instead of intervening in an existing matter. *See, e.g., Lyman Steel v. Ferrostaal Metals*,

747 F. Supp. 389 (N.D. Ohio 1990). Defendants respond with cases in which the Ninth Circuit and First Circuit limited the applicability of cases cited by Plaintiffs. *See, e.g. S.E.C. v. Ross*, 504 F.3d 1130, 1148-50 (9th Cir. 2007); *Martel v. Stafford*, 992 F.2d 1244, 1248 (1st Cir. 1993). However, all these cases are inapposite.

Two fundamental features distinguish this case from any of the cases parties cited. First, parties provide only federal court cases where intervention was undertaken pursuant to FED. R. CIV. P. 24. Second and relatedly, the cases stem from adversarial proceedings where parties sought an unjust asymmetry to benefit themselves. Dr. Charalampous' guardianship proceeding occurred in Oklahoma state court and was not adversarial.

Intervention in Oklahoma guardianship proceedings is allowed more freely than intervention under the Federal Rules of Civil Procedure. In Oklahoma, "anyone interested in the welfare of the subject of [a guardianship] proceeding may file an application to have a guardian ad litem appointed by the court." OKLA STAT. tit. 30, § 1-117. On the other hand, the Federal Rules of Civil Procedure allow only limited forms of intervention. FED. R. CIV. P. 24. Parties are entitled to intervene when the party "claims an interest relating to the property or transaction that is the subject of the action" and the action may "impede the movant's ability to protect its interest[.]" *Id.* at § 24(a)(2). Courts may allow a party to intervene if the party "has a claim or defense that shares with the main action a common question of law or fact." *Id.* at § 24(b)(2). Comparing these rules reveals a person filing a guardian ad litem petition in Oklahoma must only be interested in the welfare of another person, whereas an intervenor in a federal case must demonstrate a personal stake in the case at hand.

19

The policy underpinning the theory of jurisdiction-by-intervention stems from preventing an "unjust asymmetry" that would allow an intervenor "to enjoy the full benefits of access to a state's courts *qua* plaintiff, while retaining immunity from the courts' authority *qua* defendant in respect to claims asserted by the very party it was suing[.]" *Interpole, Inc.*, 940 F.2d at 23. In other words, subjecting an intervenor to jurisdiction in the forum ensures the intervenor may not use the forum's courts as a sword while simultaneously shielding itself from the forum court's power. Jurisdiction-by-intervention ensures a litigant may only reap the rewards of a court ruling when it bears the risk of an adverse decision.

A guardianship proceeding, however, is not a proceeding in which a personal stake was required for Lee to intervene. She petitioned the court to appoint a guardian ad litem on Dr. Charalampous' behalf. Her actions in McClain County did not resemble a motion to intervene under FED. R. CIV. P. 24, despite being captioned in state court as a "Motion to Intervene." In federal court, Defendant Lee would have had to demonstrate a personal stake in the proceedings to intervene. In the guardianship proceeding, she only had to profess an interest in another person's welfare.

Moreover, Dr. Charalampous' guardianship proceeding was not an adversarial case wherein the intervenor stood to gain or lose depending on the outcome. This is especially so because Lee sought only to have a guardian ad litem appointed. A guardian ad litem is separate from a guardian of the person or property; a guardian ad litem is appointed to guard the best interests of the ward in the guardianship proceedings. OKLA STAT. tit. 30, § 1-111(A)(8).  Thus, Defendant Lee was not staking herself against Conrad to determine

Dr. Charalampous' best interests or be appointed as his guardian. She merely requested the court appoint a neutral third party, who may well have supported Conrad's guardianship, to defend Dr. Charalampous' best interests. Even if her petition were successful, Lee was not guaranteed to reap a reward from her action; likewise, she bore no personal risk from an adverse decision. In sum, Lee wielded neither sword nor shield by intervening.

Rather, the Court finds Defendant Lee's involvement in the guardianship proceeding was much more like an *amicus curiae*. The Eleventh Circuit has suggested interested parties may promote their cause without submitting to the personal jurisdiction of court by submitting *amicus curiae* briefs. *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006). Lee professed to be interested in Dr. Charalampous' welfare and provided the Court additional information on which to base its guardianship decision. She would not have been directly affected by a ruling either way, much like a non-party *amicus*. As such, an unjust asymmetry did not arise. Lee's intervention did not submit her to personal jurisdiction in Oklahoma.

## IV.   CONCLUSION

While Dr. Charalampous is now an Oklahoma resident, the focal point of Defendants' alleged actions was Texas. That is where the events harming Plaintiffs occurred, and it is where this case must proceed. Defendants' Motions to Dismiss [Docs. 8, 32] are GRANTED on the basis of a lack of personal jurisdiction.

**IT IS SO ORDERED** this 6th day of February 2024.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE